**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| JEKEIA D. MURPHY,<br><br>Plaintiff,<br><br>v.<br><br>LANSING SCHOOL DISTRICT,<br><br>Defendant. | Case No. ________<br><br>Hon. ________________________<br>United States District Judge<br><br>Hon. ___________________<br>United States Magistrate Judge |

**PLAINTIFF'S COMPLAINT AND JURY DEMAND**

**PARTIES, JURISDICTION, AND VENUE**

1. Plaintiff Jekeia D. Murphy ("Murphy" or "Plaintiff") is a Black woman who resides in Lansing, Michigan, which is in the Western District of Michigan.

2. Defendant Lansing School District ("LSD" or "Defendant") is a Michigan public school district with its administrative offices located at 519 West Kalamazoo Street, Lansing, Michigan, which is in the Western District of Michigan.

3. Therefore, this Court has personal jurisdiction over Defendant.

4. This matter involves claims brought under federal civil rights laws, including the Americans with Disabilities Act, 42 U.S.C. § 1982, and Title VII of the Civil Rights Act of 1964; therefore, this Court has original jurisdiction over this matter.

5. Plaintiff alleges violations of the Elliott-Larsen Civil Rights Act, MCL 37.2101 et seq., and the Persons with Disabilities Civil Rights Act, MCL 37.1101 et seq. that are so

closely related to the federal claims as to be part of the same claims and controversies; therefore, this Court has supplemental jurisdiction over those claims.

6. The core operative facts and allegations in this matter took place in the Western District of Michigan; therefore, venue is proper in this Court.

**ADMINISTRATIVE EXHAUSTION AND TIMELINESS**

7. Plaintiff timely filed a charge of discrimination under Title VII and retaliation under the ADA against Defendant with the Michigan Department of Civil Rights and the United States Equal Employment Opportunity Commission ("EEOC"), which was assigned EEOC Charge Number 23A-2024-00247.

8. On August 13, 2026, the EEOC issued Plaintiff a Determination and Notice of Rights (Notice of Right to Sue) on her charge against Defendant.

9. Plaintiff files this Complaint within 90 days of her receipt of the EEOC's Notice of Right to Sue; therefore, her claims under Title VII and the ADA are properly exhausted and timely filed.

10. Plaintiff provided her resignation letter to Defendant on July 24, 2026, with an effective date of August 23, 2023.

11. Ms. Murphy had no choice but to end her employment because the hostile work environment and humiliating treatment based on her race, age, and as retaliation for having advocated for students with disabilities was so intolerable that no reasonable person would be able to continue to work under such conditions.

12. The parties entered into a written tolling agreement that tolled the running of any applicable statute of limitations on Plaintiff's claims as of July 20, 2026, to September 15, 2026.

13. Plaintiff files this Complaint within the tolled limitations period; therefore, all claims brought herein are timely.

**STATEMENT OF FACTS**

14. Plaintiff Jekeia D. Murphy is a Black woman.

15. Defendant Lansing School District hired Ms. Murphy on October 6, 2012.

16. Ms. Murphy began her career with Defendant as an English Language Arts teacher at Eastern High School, where she taught for four years.

17. She then taught for five years at Everett New Tech.

18. In 2019, Ms. Murphy joined Defendant's district leadership team as an Aspiring Principal Leader.

19. In March 2020, Ms. Murphy was promoted to Principal of Reo Elementary School.

20. As Principal of Reo Elementary, Ms. Murphy earned an annual salary of $101,500.

21. In the spring of 2022, Defendant designated Reo Elementary as the site of a new Autism Spectrum Disorder ("ASD") program.

22. A classroom of students with significant needs, some of whom required diapering and tube feedings, was staffed with only one teacher.

23. One teacher was wholly inadequate for this ASD program.

24. Beginning in the summer of 2022, Ms. Murphy repeatedly requested adequate staffing and resources to support the students in the ASD program.

25. Plaintiff's concerns included that the program was being implemented without appropriate human support, including where some students required diapering and tube feeding and a class of seventeen students was staffed with only one teacher.

26. In October 2022, Ms. Murphy filed a formal complaint with Defendant about the lack of human support for students with autism.

27. In her complaint, Ms. Murphy asserted that Defendant's failure to support these students denied them equal access to their education and violated their rights under the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and the Individuals with Disabilities Education Act.

28. Plaintiff complained that Defendant's failure to provide adequate staffing and supports denied those students equal access to education and violated disability-rights laws, including the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.

29. Plaintiff engaged in protected activity by opposing conduct she reasonably believed violated the ADA and by advocating for students with disabilities to receive the supports necessary to access Defendant's educational programs and services.

30. Defendant knew of Plaintiff's protected activity because Plaintiff made the complaint directly to Defendant and continued raising concerns about the lack of support for students with autism.

31. After Plaintiff made these complaints, Defendant's agents began subjecting Plaintiff to retaliatory treatment.

32. For instance, Defendant's Director of Special Education, in a meeting that included the Director of Special Education, questioned Ms. Murphy's professional ability to run a school building because she continued to email and call for support for the ASD program students.

33. This interaction deeply humiliated Ms. Murphy, as she is a professional who is considered knowledgeable about and committed to the needs of her students with disabilities.

34. Defendant's representatives also accused Plaintiff of "monopolizing" their time and told Ms. Murphy to scale down the frequency of her requests for support.

35. Defendant did not provide the additional staffing and resources that Ms. Murphy had requested for the students.

36. Then, in November 2022, less than a month after Ms. Murphy had registered her concerns about the lack of adequate support for the ASD classroom, she was called into a meeting with the superintendent, where Defendant announced that Reo Elementary would be combined with another elementary school at the end of the school year, eliminating Plaintiff's principal position.

37. The administration had discussed the possibility of merging schools with the teachers and administrators' union, but under information and belief, REO had not been identified to union officials as a school that might be merged with another school.

38. Nonetheless November 29, 2022, Superintendent Benjamin Shuldiner informed Ms. Murphy that Reo Elementary would be merged with Attwood for the 2023-2024 school year.

39. Superintendent Shuldiner told Ms. Murphy that enrollment at the merged school would not meet the threshold for an assistant principal, so there would be no administrative position for her during the 2023-2024 school year.

40. Superintendent Shuldiner stated that Ms. Murphy's performance was not an issue or a consideration in this decision.

41. The selection of Reo for merger and the elimination of Ms. Murphy's principal position were motivated by race discrimination and retaliation for her protected activity, and not by any legitimate, nondiscriminatory business reason.

42. Superintendent Shuldiner told Ms. Murphy to apply for teacher positions and remarked that he was not familiar with her personnel file.

43. As originally scheduled by Superintendent Shuldiner, the November 29, 2022, meeting at which Ms. Murphy was informed of the merger and the elimination of her position would have included only Defendant's senior administrators — and Ms. Murphy would have been the only non-white person present.

44. What's more, even though Defendant school district is majority minority—that is over half of students are Black, the administrators and teachers employed by Defendant are minority Black.

45. Additionally, under information and belief, Defendant school district has a far higher attrition and turnover rate among Black teachers and administrators than white

teachers and administrators due to the discriminatory and hostile conduct of Defendant and its senior officials toward Black employees.

46. Ms. Murphy herself added her direct supervisor, Kim Johnson-Ray, to the meeting;

47. Ms. Johnson-Ray had no advance knowledge of the subject of the meeting and was not involved in the decision to eliminate Ms. Murphy's position.

48. Defendant eliminated Ms. Murphy’s principal position without first consulting her union, the Lansing Association of School Administrators.

49. Ms. Murphy had no choice in this matter and was demoted from Principal to Assistant Principal at Attwood for the 2023-2024 school year.

50. Ms. Murphy was the only administrator whose position was eliminated and who was demoted as a result of the merger.

51. On December 3, 2022, Superintendent Shuldiner called Ms. Murphy to retract the elimination of her employment and instead offered her a demoted assistant principal position at the newly merged school.

52. Due to union pressure, Defendant redlined Ms. Murphy’s salary at her principal rate of $101,500 for only one year, after which her compensation in the demoted role would be reduced.

53. Defendant provided no application process and no opportunity for Ms. Murphy to be considered for the principal position at the merged school.

54. Throughout the 2022-2023 school year, Defendant's administrators repeatedly criticized Ms. Murphy for wearing a mask, which she wore out of medical necessity.

55. Ms. Murphy wore a mask as a medically necessary protection through the 2022-23 school year for her grandmother, who had severe illnesses and had to be protected from germs and illness.

56. Defendant, through its administrators, knew that Ms. Murphy wore a mask out of medical necessity, as she was caring for her grandmother, who was receiving hospice care and could not be exposed to germs.

57. Despite this knowledge, Defendant's administrators told Ms. Murphy that she needed to stop wearing her mask so that she would appear more "approachable," and suggested that her mask may have contributed to her appearing "unhappy" in district administration meetings.

58. On March 7, 2023, Ms. Murphy’s supervisor, Kim Johnson-Ray, proposed a growth plan for Ms. Murphy’s “demeanor.”

59. The proposed growth plan was not based on any performance assessment tool.

60. Furthermore, no concerns about Ms. Murphy’s work performance were raised in connection with this proposed “demeanor” growth plan.

61. Rather, it is a common trope of race bias that Black women present as "angry" or without the appropriate "demeanor" for their professional roles.

62. Thus, this “demeanor” growth plan was nothing but an attempt based in racial bias and stereotyping to get Ms. Murphy to act less like a Black woman.

63. Ms. Murphy refused to sign the growth plan, stating that it is career suicide for a Black woman to sign and agree to a growth plan for demeanor.

64. Thus, Ms. Murphy refused to ratify such a biased and stereotyped depiction of herself.

65. This “growth plan” was never put into place.

66. After all, it was just another effort to demean and harass Ms. Murphy to force her to resign.

67. On May 5, 2023, Defendant’s Director of Human Resources, Mark Manley, issued Ms. Murphy a written Notice of Pre-Disciplinary Hearing.

68. The notice charged Ms. Murphy with violating Board Policy 8390 and Board Policy 2260 by permitting a dog to be in her building without approval.

69. Ms. Murphy had allowed a trained dog to attend reading classes with the youngest students at her school, as there a numerous studies showing that young children can make great reading progress by reading allowed to dogs.

70. Upon information and belief, Defendant had never disciplined a principal or school employee for having animals in the building, as it is common in the younger grades to use animals for learning exercises.

71. Indeed, several teachers routinely had animals in their classrooms.

72. The notice warned Ms. Murphy that Defendant was considering disciplinary action against her, up to and including termination.

73. At the hearing, held on May 31, 2023, Ms. Murphy pointed out that white district staff had brought animals into district buildings, including a district staff member pictured and applauded in the Superintendent’s Newsletter holding chickens inside a school.

74. Neither this staff person nor her principal was disciplined for having chickens in their school.

75. On June 12, 2023, Ms. Murphy received a Memorandum of Outcome stating that no violations of Board Policy were found during the district's discovery process regarding the dog allowed into Ms. Murphy's school to assist younger children with their reading.

76. This was one of several instances when Ms. Murphy was singled out for disciplinary treatment that was solely to harass her and get her to resign: it was not based on any genuine concerns about her conduct.

77. Indeed, around this time Ms. Murphy was placed on a list of principals sent to the Board of Education who were being encouraged to resign.

78. Over the 22-23 school year, the only administrators whom Defendant subjected to disciplinary, pre-disciplinary, and investigatory meetings were Black women.

79. On or about June 12, 2023, Ms. Murphy was overlooked for consideration when Defendant merged the schools and selected a principal for the merged school.

80. Of the three principals affected by mergers in the 22-23 school year, two were Black women and one was white.

81. That one white reassigned principal was not subjected to fact-finding meetings, pre-disciplinary meetings, administrative leave, or the increased scrutiny that Defendant applied to Ms. Murphy.

82. Defendant deliberately made Ms. Murphy's working conditions so intolerable, through the unwarranted scrutiny, discipline, demotion, and other actions against her, that a reasonable person in her position would have felt compelled to resign.

83. Ms. Murphy was compelled to resign her employment in order to protect her mental, emotional, and physical health.

84. Ms. Murphy provided her notice of resignation on July 24, 2023, with an effective date of August 21, 2023.

85. As a result of Defendant's unlawful conduct, Ms. Murphy suffered lost wages and benefits, including lost paid time off.

86. Ms. Murphy also performed more than one hundred additional hours of merger-related work that were not required of other principals.

87. As a result of Defendant's unlawful conduct, Ms. Murphy incurred the cost of ongoing mental health treatment, including biweekly therapy over approximately three years.

88. As a result of Defendant's unlawful conduct, Ms. Murphy also suffered harm to her professional reputation and severe emotional distress.

**COUNT I: RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981**

89. Plaintiff incorporates all prior allegations by reference here.

90. 42 U.S.C. § 1981 protects the right of all persons to make and enforce contracts on the same terms as white citizens, and this right applies to the employment relationship.

91. The right to make and enforce contracts includes the making, performance, modification, and termination of contracts and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981(b).

92. Ms. Murphy is Black and was qualified for the positions she held with Defendant.

93. Defendant intentionally discriminated against Ms. Murphy on the basis of her race by eliminating her principal position, demoting her, denying her consideration for the principal position at the merged school, and subjecting her to disparate discipline and heightened scrutiny.

94. Defendant engaged in hostile and adverse treatment of Plaintiff by trying to force her to sign on to a growth plan for her "demeanor," which was an explicit criticism of her based on her race and not related to any genuine evaluation of her performance.

95. But for Ms. Murphy's race, Defendant would not have eliminated her position, demoted her, denied her promotion or transfer, or subjected her to disparate discipline and scrutiny.

96. As a direct and proximate result of Defendant's unlawful race discrimination, Ms. Murphy has suffered economic damages, harm to her professional reputation, humiliation, and severe emotional distress.

**COUNT II: RETALIATION IN VIOLATION OF 42 U.S.C. § 1981**

97. Plaintiff incorporates all prior allegations by reference here.

98. 42 U.S.C. § 1981 prohibits retaliation against a person because the person has opposed race discrimination in the making and enforcement of contracts.

99. Ms. Murphy engaged in protected activity when she opposed Defendant's discriminatory treatment of her on the basis of her race.

100. Defendant knew of Ms. Murphy's protected activity.

101. Defendant took materially adverse actions against Ms. Murphy, including subjecting her to unwarranted discipline and heightened scrutiny, denying her promotion or transfer, and constructively discharging her.

102. Ms. Murphy engaged in protected activity when she opposed Defendant's discriminatory treatment of her on the basis of race, including by refusing to sign a growth plan for her "demeanor" and by raising the disparate discipline of Black administrators.

103. But for Ms. Murphy's protected activity, Defendant would not have taken these materially adverse actions against her.

104. As a direct and proximate result of Defendant's retaliation, Ms. Murphy has suffered economic damages, harm to her professional reputation, humiliation, and severe emotional distress.

**COUNT III: RACE DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000E ET SEQ.**

105. Plaintiff incorporates all prior allegations by reference here.

106. Title VII prohibits an employer from discharging or otherwise discriminating against any individual with respect to the terms, conditions, or privileges of employment because of the individual's race. 42 U.S.C. § 2000e-2(a)(1).

107. Ms. Murphy is a member of a protected class because she is Black.

108. Ms. Murphy was qualified for the positions she held with Defendant.

109. Defendant subjected Ms. Murphy to adverse employment actions because of her race, including eliminating her principal position, demoting her, denying her consideration for the principal position at the merged school, subjecting her to disparate discipline and heightened scrutiny, and constructively discharging her.

110. Defendant engaged in hostile and adverse treatment of Plaintiff by trying to force her to sign on to a growth plan for her "demeanor," which was an explicit criticism of her based on her race and not related to any genuine evaluation of her performance.

111. Defendant treated similarly situated non-Black administrators more favorably than Ms. Murphy.

112. As a direct and proximate result of Defendant's unlawful race discrimination, Ms. Murphy has suffered economic damages, harm to her professional reputation, humiliation, and severe emotional distress.

**COUNT IV: RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000E ET SEQ.**

113. Plaintiff incorporates all prior allegations by reference here.

114. Title VII prohibits an employer from retaliating against an individual because the individual has opposed a practice made unlawful by Title VII or has made a charge, testified, assisted, or participated in an investigation, proceeding, or hearing under Title VII. 42 U.S.C. § 2000e-3(a).

115. Ms. Murphy engaged in protected activity when she opposed Defendant's discriminatory treatment of her on the basis of race and as she raised concerns about her hostile treatment, demotion, and being denied opportunities for promotion because of her race.

116. Ms. Murphy engaged in protected activity when she opposed Defendant's discriminatory treatment of her on the basis of race, including by refusing to sign a growth plan for her "demeanor" and by raising the disparate discipline of Black administrators.

117. Defendant knew of Ms. Murphy's protected activity.

118. Defendant took materially adverse actions against Ms. Murphy, including subjecting her to unwarranted discipline and heightened scrutiny, denying her promotion or transfer, and constructively discharging her.

119. There was a causal connection between Ms. Murphy's protected activity and the materially adverse actions taken against her.

120. As a direct and proximate result of Defendant's retaliation, Ms. Murphy has suffered economic damages, harm to her professional reputation, humiliation, and severe emotional distress.

**COUNT V: RETALIATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12203**

121. Plaintiff incorporates all prior allegations by reference here.

122. The Americans with Disabilities Act makes it unlawful to discriminate against, intimidate, threaten or otherwise interfere with any individual because they have assisted another individual in exercising their rights under the ADA. 42 U.S.C. § 12203.

123. Ms. Murphy engaged in protected activity when she filed a formal complaint in October 2022 opposing Defendant's failure to provide adequate support to students with autism and disabilities.

124. In that complaint, Ms. Murphy asserted that Defendant's failure to support these students denied them equal access to their education and violated their rights under laws protecting persons with disabilities.

125. Ms. Murphy explained that failing to provide these necessary services violated the students' rights under numerous state and federal laws.

126. Defendant knew of Ms. Murphy's protected activity.

127. Defendant took adverse employment actions against Ms. Murphy after she engaged in this protected activity, including reprimanding her, eliminating her principal position, demoting her, subjecting her to unwarranted discipline and heightened scrutiny, and constructively discharging her.

128. There was a causal connection between Ms. Murphy's protected activity and the adverse employment actions, and her protected activity was a significant factor in those actions.

129. Defendant's retaliatory actions, including the elimination of Plaintiff's position, the proposed demotion, increased scrutiny, threatened discipline, and continued hostile treatment, would dissuade a reasonable employee from opposing disability discrimination or advocating for students' rights under the ADA.

130. Defendant's conduct caused Plaintiff to resign on or about July 24, 2023, because the retaliation would not stop.

131. As a direct and proximate result of Defendant's retaliation, Ms. Murphy has suffered economic damages, harm to her professional reputation, humiliation, and severe emotional distress.

**COUNT VI: RACE DISCRIMINATION IN VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT, MCL 37.2101 ET SEQ.**

132. Plaintiff incorporates all prior allegations by reference here.

133. The Elliott-Larsen Civil Rights Act ("ELCRA") prohibits an employer from discharging or otherwise discriminating against an individual with respect to a term, condition, or privilege of employment because of race. MCL 37.2202(1)(a).

134. Ms. Murphy is a member of a protected class because she is Black.

135. Ms. Murphy was qualified for the positions of Principal and Assistant Principal.

136. Defendant subjected Ms. Murphy to adverse employment actions, including eliminating her principal position, demoting her to Assistant Principal, denying her consideration for the principal position at the merged school, subjecting her to disparate discipline and heightened scrutiny, and constructively discharging her.

137. Defendant treated similarly situated non-Black administrators more favorably than Ms. Murphy.

138. Defendant engaged in hostile and adverse treatment of Plaintiff by trying to force her to sign on to a growth plan for her "demeanor," which was an explicit criticism of her based on her race and not related to any genuine evaluation of her performance.

139. Race was a motivating factor and a factor that made a difference in Defendant's decisions to eliminate Ms. Murphy's position, demote her, deny her promotion or transfer to the principal position, and subject her to disparate discipline and scrutiny.

140. As a direct and proximate result of Defendant's unlawful race discrimination, Ms. Murphy has suffered economic damages, harm to her professional reputation, humiliation, and severe emotional distress.

**COUNT VII: HOSTILE WORK ENVIRONMENT IN VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT, MCL 37.2101 ET SEQ.**

141. Plaintiff incorporates all prior allegations by reference here.

142. The ELCRA prohibits a racially hostile work environment that affects a term, condition, or privilege of employment. MCL 37.2202(1)(a).

143. Ms. Murphy is a member of a protected class because she is Black.

144. Ms. Murphy was subjected to unwelcome conduct and communication on the basis of her race, including disproportionate discipline, unwarranted pre-disciplinary proceedings, heightened scrutiny, a proposed growth plan targeting her "demeanor," and repeated criticism of her appearance.

145. This conduct was sufficiently severe or pervasive that, under the totality of the circumstances, it substantially interfered with Ms. Murphy's employment and created an intimidating, hostile, and offensive work environment.

146. A reasonable person in Ms. Murphy's position would have perceived the work environment as hostile.

147. Defendant had notice of the racially hostile work environment and failed to take prompt and adequate remedial action to correct it.

148. The acts contributing to the racially hostile work environment continued through Ms. Murphy's constructive discharge and formed a single, continuing unlawful employment practice.

149. The hostile work environment was so intolerable that a reasonable person in Ms. Murphy's position would have felt compelled to resign, and Ms. Murphy was constructively discharged.

150. As a direct and proximate result of the racially hostile work environment, Ms. Murphy has suffered economic damages, harm to her professional reputation, humiliation, and severe emotional distress.

**COUNT VIII: RETALIATION IN VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT, MCL 37.2101 ET SEQ.**

151. Plaintiff incorporates all prior allegations by reference here.

152. The ELCRA prohibits retaliation against a person because the person has opposed a violation of the Act or made a charge, filed a complaint, or participated in a proceeding under the Act. MCL 37.2701(a).

153. Ms. Murphy engaged in protected activity when she opposed Defendant's discriminatory treatment of her on the basis of race, including by refusing to sign a growth plan for her "demeanor" and by raising the disparate discipline of Black administrators.

154. Defendant knew of Ms. Murphy's protected activity.

155. Defendant took adverse employment actions against Ms. Murphy, including subjecting her to unwarranted discipline and heightened scrutiny, denying her promotion or transfer, and constructively discharging her.

156. There was a causal connection between Ms. Murphy's protected activity and the adverse employment actions, and her protected activity was a significant factor in those actions.

157. As a direct and proximate result of Defendant's retaliation, Ms. Murphy has suffered economic damages, harm to her professional reputation, humiliation, and severe emotional distress.

## COUNT IV: RETALIATION IN VIOLATION OF THE PERSONS WITH DISABILITIES CIVIL RIGHTS ACT, MCL 37.1101 ET SEQ.

158. Plaintiff incorporates all prior allegations by reference here.

159. The PWDCRA also prohibits coercing, intimidating, threatening, or interfering with any person because that person has aided or encouraged any other person in the exercise or enjoyment of a right protected under the Act. MCL 37.1602(f).

160. Plaintiff engaged in protected activity when she filed a formal complaint in October 2022 opposing Defendant's failure to provide adequate support to students with autism and disabilities.

161. In that complaint, Ms. Murphy asserted that Defendant's failure to support these students denied them equal access to their education and violated their rights under laws protecting persons with disabilities.

162. Defendant knew of Ms. Murphy's protected activity.

163. Defendant took adverse employment actions against Ms. Murphy after she engaged in this protected activity, including reprimanding her, eliminating her principal position, demoting her, subjecting her to unwarranted discipline and heightened scrutiny, and constructively discharging her.

164. Ms. Murphy's protected activity was a significant and motivating factor in Defendant's having taken the above-alleged adverse employment actions against her.

165. As a direct and proximate result of Defendant's retaliation, Ms. Murphy has suffered economic damages, harm to her professional reputation, humiliation, and severe emotional distress.

## REQUEST FOR RELIEF

On the basis of the above allegations and claims, and pursuant to 42 U.S.C. § 1981a, 42 U.S.C. § 1988, MCL 37.2801, and MCL 37.1606, Plaintiff respectfully requests the following relief:

A. An award of economic damages reflecting Ms. Murphy's lost wages, lost benefits, and other economic harm caused by Defendant's unlawful conduct;

B. An award of compensatory damages for the humiliation, harm to reputation, and severe emotional distress caused by Defendant's unlawful acts of discrimination and retaliation;

C. A declaration that Defendant's acts and omissions violated the Elliott-Larsen Civil Rights Act, the Persons with Disabilities Civil Rights Act, 42 U.S.C. § 1981, the ADA, and Title VII;

D. An award of punitive damages to the extent permitted by law for Defendant's intentional and reckless disregard of Ms. Murphy's rights;

E. Reasonable attorney's fees, expert fees, and costs;

F. An order enjoining Defendant from continuing to engage in the unlawful practices alleged in this Complaint; and

G. Any and all other relief that this Court deems just and proper.

Respectfully submitted by:

*/s/ Robin B. Wagner*
Robin B. Wagner (P79408)
Attorney for Plaintiff
Robin Wagner Law, PLLC
402 W. Liberty Street
Ann Arbor, MI 48103
734-294-3035
robin@robinwagnerlaw.net

Dated: September 15, 2026

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| JEKEIA D. MURPHY,<br><br>Plaintiff,<br><br>v.<br><br>LANSING SCHOOL DISTRICT,<br><br>Defendant. | Case No. ________<br><br>Hon. ________________________<br>United States District Judge<br><br>Hon. ___________________<br>United States Magistrate Judge |

**JURY DEMAND**

Plaintiff hereby requests that this matter be tried before a jury.

Respectfully submitted by:

*/s/ Robin B. Wagner*
Robin B. Wagner (P79408)
Attorney for Plaintiff
Robin Wagner Law, PLLC
402 W. Liberty Street
Ann Arbor, MI 48103
734-294-3035
robin@robinwagnerlaw.net

Dated: September 15, 2026